Very good. We'll start with the first case, Anandijik's Securities Litigation.  Thank you. To be very honest, my name is Mark Harrison, and I represent the plaintiffs' appellants in this case. With me at the table are Angelina Nguyen from my firm, and Mark Coleman, and I reserve five minutes for rebuttal. In dismissing this securities fraud complaint, the District Court committed several reversible errors. First, we say that the District Court misapplied the law with respect to what is a fraudulent omission. Second, we say that the District Court misapplied the concept that the plaintiffs are entitled to the complaint being read in the light most favorable to the plaintiffs. Third, Your Honors, the District Court committed reversible error in the way it dealt with assessing the reliability and credibility and the information from the confidential witnesses that we pled in the complaint. And fourth, Your Honors, the District Court committed reversible error in the way it dealt with the law with respect to forward-looking statements and the safe harbor that's provided by the PSLRA. I want to start first, Your Honors, with the issue that is raised by what the Court did with respect to the omissions that were pled in our complaint. It is quite clear under the law that is developed in 10b-5 world that a statement that is made can be false and misleading. If important information that would make the statement that is made not misleading is omitted. There are quite a few statements that we're talking about here. You're stating the broad principles, but it would be helpful if you can maybe focus on those statements that the Court found were not misleading that you feel, most importantly, actually were not misleading, but in fact, truthful. Just to put it in context, and yes, context is important. This is a company that was poised to profit from what everybody knew was a surge in the demand for a product that it made that was used by the manufacturers of cell phones. In the years that issue here, 2007-2008, the cell phone market was exploding and it had moved from a certain technology to what they called the 3G technology, and AnaDigix was a company that was producing a product that was in high demand by the manufacturers of these cell phones. The demand was so great that AnaDigix represented through the class period, the thrust of its representations through the class period, was that we have this product, it is in high demand, we are poised to take advantage of this high demand, and in doing so, we are increasing our capacity to manufacture this product, and we are further growing our market share. Nothing wrong with any of that, is there? I mean, it's all forward-looking statements, we are looking forward to, we are increasing cell phones? Well, I'll get to the forward-looking statements. Those statements are, in fact, not forward-looking, as we pointed out in our brief. We are increasing our market share, it is about the present, and we are increasing our capacity to manufacture, it is a present statement, and as we pointed out in our brief, none of those statements are forward-looking statements. Can you tell me why we are increasing our market share is not a forward-looking statement? Sure, because in the context, first of all, it says we are further increasing our market share. So what that means to the investing public is here we have a company that is saying we have, in the context of, for example, the first press release, we have had a record quarter. Our revenues were record, record revenues. We have a product that is in such high demand that we are increasing our capacity to make this product. There's nothing misleading about the idea that revenues were at record levels. We don't allege that, Your Honor. Pardon? We do not allege so, no. I agree with you. Okay. Right, nothing misleading about that. But the context is that revenues were record, record revenues, and we are increasing our capacity to make this product, present test. Is that okay? It's, it's, it's... We are increasing the capacity, they have already ordered machinery. Here's why it's not okay. You're setting up a fad in China. Here's why it's not okay. Because the, because the impression is that they are increasing their capacity to make the product and they are further increasing... No, that they're increasing their manufacturing capacity. Right. At a time, at a time, they're saying this, that they knew they could not do so. They knew they could not do so because what they omitted to tell the public, and this is the fraudulent omission, they omitted to tell the public several things. They omitted to tell the public that their customers or their key customers were canceling orders. What does that have to do with manufacturing capacity? Well, okay, manufacturing capacity, Your Honor, in connection with the manufacturing capacity, what they, what they failed to disclose, the omission with respect to the manufacturing capacity, is that there was a essential piece of equipment called the via etcher, an essential piece of equipment that was required in order to increase the manufacturing capacity, that they did not have. But they would have in the near future. They would have maybe within eight months. Six months is what you're saying. Six to eight months. Six months to get it and two more months to install it and make it work. And in the, in the world that we're talking about here where, you know, when you buy a cell phone, the day after you buy it, it's already obsolete. In this, in this world where they are increasing the manufacturing capacity but fail to tell the public that they don't have the actual piece of equipment in order to do so, that is a false and misleading statement by omission. It's no different, for example, than the omission that the Supreme Court found in last term in the Matrix case where the statement to the public was we are increasing our revenues. We are increasing our revenues. A true statement. We are increasing our revenues. What they failed to tell the public and what the Supreme Court said was a fraudulent omission under 10b-5 was that there was a risk to their, their essential product that, that might be causing some side, it was a drug company that might be causing some important side effects. It wasn't even established that the drug always caused the side effect, but there was some, some anecdotal evidence that the particular drug was causing side effects in some people and that was not disclosed to the public and the, the Supreme Court said, well if you are telling the public about increasing revenues and there is a risk to your main major product, that that is a fraudulent omission. That's a permanent risk, right? I'm sorry? That's a permanent risk. I mean that major product is going to be no good. Whereas no one is telling MDGICs that their cell phones are not going to be any good. They've got a hitch in getting some of the equipment in their expansion to expand what they're making. They are telling the public that, that we are increasing our capacity to produce the product at a time they cannot do so. Doesn't this matter come under the safe harbor provision? Which, which? Well we are increasing, it's a forward looking statement, isn't it? We are increasing our production capacity. The sense, the sense of what they told the public in that press release that I'm referring to is a present tense, we are working today to increase our, our, our manufacturing capacity. Doesn't ordering via Etchers satisfy that statement? It, it doesn't satisfy the statement, Your Honor. You're not telling the public that, well we've ordered via Etchers in January, this is now February. We can't get those via Etchers in here until June. And they won't be working online until August. And you're telling the public... We're still working, we're still working to increase their manufacturing capacity. We're just doing it at a pace that, that may be, in fact, turned out to be apparently quite ineffectual in this case. And if I'm a shareholder and I'm putting my money into this company, I want to know that when the company is telling me that the company is increasing its capacity to manufacture a key product, in an industry where life cycles are a year, that they're not going to be able to do this and compete with their competitors in time for me to make money by investing in this stock. So if the company is telling me they're increasing their manufacturing capacity, I would like to know as a shareholder that they can't do that in the next eight months. Is there another misleading statement that you want to point to? I see your time is, is moving very quickly. It always does, Your Honor. Perhaps there's another one that you want to stress. So the point is increasing manufacturing capacity and further improving our market share, further improving our market share and telling the public when, which is of course important to stockholders and investors, when at the very time they are in fact losing market share. At the very time they are in fact losing their market share. So that is the thrust of the statements that we claim were false by omission. And my time is up, Your Honor. Let me ask you this question because I had some thoughts about this one myself. During the conference call, I think it was the July call, one of the analysts asked him, do you think your supply caught up to demand?  You remember that one? I do. And Mr. Bastani said, yes, yes, my supply has caught up to demand. Well, Judge Cooper found that statement to be false. The omission that supply had caught up with demand was false. The statement that supply had caught up with demand was false. Judge Cooper, in her opinion, found that was false. That was one of the two statements that she found was false. All right. Now is that grounds for the complaint to go forward? Certainly it is, yes. Did Judge Cooper find it sufficient? She did not because she found that, although false, she found that the complaint did not adequately please the editor with respect to that statement. And in our brief, we explain why. Why Mr. Bastani knew that it was false? Sure, because at the time that he's claiming supply met up with demand, he was continuing to lose market share because he couldn't fill the orders of his customers. And within weeks, a couple of weeks after that very statement, they told the market that, in fact, we are losing market share. We have not filled our customers' orders, that the customers, in fact, were dual sourcing two quarters ago. And a week and a half after that, he left the company. So there certainly is sufficient evidence in the complaint that establishes the editor. So, you know, this is a- Well, the district judge found it was false. She did. She said she didn't find it false. That's an old statement. I think that's what she said. She found that the complaint sufficiently pled falsely with respect to that statement. All right. Thank you. Thank you, Earl. Mr. Alessi? Good morning, Your Honors. My name is Robert Alessi. I'm co-counsel for the defendant, half-L.E.s in this case. Could you touch on that last point for a moment? Yes. The statement of Mr. Vestani. Yes. Supply has caught up with demand. Yes. It doesn't sound like that's accurate. Your Honor, we actually- It's the one piece of the district court's opinion with which we disagree. The district court applied its scientific analysis and concluded that the complaint didn't come close to pleading any particularized facts that would show that as of July 22, 2008, Dr. Vestani would have any reason to know that demand, in fact, had not caught up with supply. In fact, what Judge Cooper found- He had no reason to know that supply had- He had no reason to believe that demand had not, in fact, caught up with supply because of- Is he the CO? No, because what she says, and she points to the plaintiff's own complaint, she says that as of July 22, 2008, Ana Digis was already telling the world it had seen a weakening in demand for its wireless products. In fact, the court goes on to say at page 885 of the joint appendix, if Dr. Vestani knew that the company had lost market share as of July 22, 2008 and was also predicting weakened demand in the wireless handset market during that same earnings call, this is consistent with his statement that supply and demand were now pretty well in balance, given that demand had far exceeded supply before then. In fact, we believe that the district court's analysis with respect to Sciento is, in fact, a reason to find that those two statements are not adequately fled as being false. What she finds, Your Honor, is that there is simply, in this case, an absolute lack of particularized pleading. If I may just go back for a minute- I thought at that point that the customers were over-ordering, they were double-sourcing because the supply was not keeping up with the demand, right around this period of time. So how can then he say supply has caught up with demand when the customers were, in essence, going to other suppliers? No, in fact, Your Honor, what she finds is that nowhere does the complaint plead any particularized fact showing that a single order was canceled. And therefore, she says, there's no basis pled in this complaint to suggest that he, Dr. Vestani, would know as of that moment that what he thought was a temporary decline in demand. Remember, on July 22nd, very importantly, what Dr. Vestani and Adedijic announced as well is that they are going full with their China expansion plan. They are continuing to build the China fab because they believe that that dip in wireless is temporary. And as they get into the holiday season, later in the year, and, of course, we have the financial meltdown and recession that hit at the end of the summer of 2008, they expect that demand to come back up. As they explained on August 7th and August 8th when they held their conference call, it wasn't until after July 22nd that the company went back and had more in-depth conversations with its customers and found that these customers, in fact, had higher levels of inventory than they originally had indicated. Again, none of that is surprising. When you place customers on allocation, as the company did in late 2007 and early 2008, the last thing that a company is going to do, your customer is not going to come back. Is a higher level of inventories relevant, given the increase in demand? Yes, and given the fact that they were double-ordering and outsourcing. In other words, they wanted more, not less. No, that's the crux here. There's nothing plugged with any particularity in this complaint that suggests that what the plaintiffs looked at in hindsight was known to Addigix during the class period. In fact, what Addigix was looking at, the one key metric, was the following. It enjoyed record sales from pre-class period through the first quarter of 2008 through the second quarter of 2008, back to the quarter end of June 30, 2008. It actually sold $80.5 million worth of its product, the highest it had ever done. So while it was working shifts and the smoke was coming out of the factory, it was churning out more product than it ever had churned out. Wasn't it the failure of the supply to keep up with demand that caused the bottom to fall out? What do you mean by the bottom to fall out? It took a big hit, didn't it? I think it was the perfect storm, Your Honor. But wasn't it because the supply was not keeping up with demand and therefore the customers were going to other suppliers? Well, as I said, Your Honor, I don't believe the complaint pleads adequately. That's the sole reason. I guess the bottom falling out is a little bit too strong. They're still in business, aren't they? They're still in business, Your Honor, and the perfect storm is as follows. On August 7, this company pre-announced, after having gone back to its customers, it did not wait until the third quarter, as it would have to in terms of its filings, to announce. They came back to the market and said, we're ratcheting down our guidance. What we thought on July 22 was going to be a temporary blip in wireless now looks like it may be a more substantial blip for two reasons. Yes, it looks like, in hindsight, that some of our customers were dual sourcing during this period of time or over-ordering and therefore stockpiling. But in addition, let's remember where we were in August of 2008 and September of 2008. We're heading into this economic slowdown globally. So yes, it made the second part, the last quarter or so of 2008, very, very difficult for this company. No question about it. Are they still in business? They're absolutely still in business, Your Honor. I'm not sure I understand what you're arguing because I thought it was a given in this case that your client was deemed to be an unreliable supplier or a less reliable supplier than some of its competitors and that caused it to suffer economic harm and lose some market share. Are you saying that's not the case? What I'm saying, Your Honor, is when you talk about the two statements we've been talking about, that is, according to the district court, a scienter analysis. That requires particularized facts. I don't understand that. And there is none. Okay. But you're not denying that your client was unable to produce the products and supply the products with sufficient volume to perform well vis-à-vis some of its peers. That's fair, right? It is fair. In fact, the company disclosed that. Right. So then the question becomes, in light of the lag time with the ordering of the Via Etchers and getting them online, why wouldn't they have known that at the time they ordered the Via Etchers? Why wouldn't they have known that there was this built-in delay or built-in inability to produce sufficient numbers of products to meet demand? Well, Your Honor, because they kept increasing what they could produce. And as the district court found in pages A60 through 61 of the joint appendix, she said the following. The mere existence of the Via Etcher problem, which defendants generally disclosed in the February 12, 2008, earnings call, which is at joint appendix 328, does not compel the logical conclusion that any statements by the defendants regarding efforts to increase manufacturing capacity must be false in this meeting. And remember what the allegation here is. The allegation is that confidential witness one suggested that the Via Etcher be ordered sometime in October or so of 2007. And in fact, using an independent manufacturing consultant, Analytics and its consultant decided that January 2008 was an appropriate time to order the Via Etcher. What the district court found, very importantly, is that that information was out there. The company itself told the world, we don't expect to be able to reach full capacity until sometime in the second half of 2008. Why? Because we are bringing on equipment, we are bringing on people, we are training them, and all this takes time and it's a whole calibration. We don't expect to be there until third, fourth quarter of 2008. And what the district court found is that that was material information that the market needed to know. It didn't need to know that it was something called Via Etcher or something called this. That material information was out in the market. So would it be material information for the investors to know that supply has caught up with demand? Because that means your production, it would seem to me that your production is keeping up with the increased demand by customers. And he, Mr. Vestani, says yes, that's correct. Now you're saying even though that may be misleading, he did not know that supply was falling behind demand. Is that your position? Yes. And you're saying Sienta was not proven. Is that what you're saying? That's what the court found. We agree with that. We go a step further and we say that we don't think they've pled falsely adequately with respect to those two statements, but certainly they haven't come close to pleading to particularize facts which would give rise to a strong influence of Sienta as to those statements. And part of the problem here is the following. At its core, the second event of complaint fails for what I would call its reliance on Oscar Madison style cleaning. In a vintage movie, The Odd Couple, there's a scene where Oscar Madison in his typically aggressive style picks up a plate of linguine that Felix has just prepared and is about to consume and heaves it against the kitchen wall. As Oscar turns back to look at Felix, the audience watches in disgust as the individual strands of linguine drip down the sauce-covered wall, bearing little resemblance to that magnificent meal that Felix had just prepared. Similarly here, the plaintiffs have tossed against the wall 15 statements. And they ask this court to focus in a vacuum upon individual strands that have dripped down the wall, strands that bear little resemblance to the fuller context of the statements from which they were wrenched out of context. It's also important to understand what the district court did here. Twice she found that the plaintiffs had failed to plead a viable claim for securities fraud. The district court rolled up its sleeves and devoted much time and effort after the original complaints were filed in 2008. There was a First Amendment consolidated complaint filed in 2009. The district judge reviewed all the pleadings, all the briefing, and then held what in my experience is an unprecedented three and one half hours of oral argument in August of 2010, at the conclusion of which she found that the First Amendment complaint was deficient of allowing the plaintiffs another opportunity to plead. And they did. They filed a second one. She then went back, a new round of briefing. She looked at all the briefing again, the pleadings. And then she crafted a very carefully reasoned 85-page opinion in which she found that all the statements, except with the possible exception of the two on July 22nd, were not false. So stop right there. Don't go forward. With respect to the two that she found could plausibly have been pled as false, she found nothing close to an inference of scienter. And then in addition, she found that 11 out of the 15 statements are protected as immature expressions of optimism and go forward looking statements covered by the safe harbor. So I would be happy to go through any particular issues that the court would like. But we submit that what the district judge did on these two motions over the past three or four years is precisely what a district judge is supposed to do. At the conclusion of which, she dismissed the Second Amendment complaint with prejudice because she concluded it would be futile to allow this place a fourth bite at the apple. Okay, Mr. Alessio, let me ask you this one additional point, which was a statement that an analyst made. I think it was a July 22nd call. And the statement is addressing Mr. Bastani. You mentioned you don't have the capacity to meet some of the demand out there. This is paragraph 155 of the complaint. Is that all on the 3G side of things right now? Is that some other legacy as well? And his response was, that was a comment about the past. That was like a Q4, Q1 comment. Is that accurate? Is that misleading? Because it seems like it was about the presence of the past. It is in fact accurate, Your Honor, because he understood that question, as we understand that question, to deal with the period of time, the temporary period of time when the customers were on allocation. That was a late 2007, early 2008 time period. So when he says that it was a comment about the past, it is completely accurate. What the district court found, with respect to those statements, at page 884 of the joint appendix and 886, is he said, the plaintiff simply alleged no facts from which the court could infer that Bastani acted with the requisite mental state in stating in July 22, 2008, that supply and demand had evened out. The comment that he made, quote, a comment about the past, does not rise to the level of recklessness or intent to deceive, but rather comes off at most careless or negligent. That's at page 884 of the joint appendix. And we agree with the court on that, Your Honor. Okay. Good. Mr. Ressler, thank you very much. Thank you. Anything else? Mr. Harrison, you'll let us know if any of that spaghetti managed to stick to the wall. Well, we're hoping a lot of it sticks, Your Honor. We think that the case is kind of mean by calling it spaghetti on the wall, but this is a fraud case, we're sure it will never hurt. Mr. Alessi, in his brief and here, he talks about the record sales that the company reported. Of course, those sales had to do with products that were manufactured before. We're talking about representations about the ability to manufacture today. And it was the problem with manufacturing today that is at the core of the case here, and that the inability to manufacture today and supply the customers with what they needed that resulted in the customers doing so and going elsewhere. I imagine, during the same period of time, I was thinking, given the evolving handheld devices and the demand for more speed and capacity, that this probably was a fairly common problem, that is that demand was outpacing supply in various sectors. Do you think that's fairly accurate? I think that is true. And that is why, when the shareholders of a company like this are in the stock, they're in it for the current product. And who knows what's going to happen for the next cycle, but for the current product, this company was poised, because of its technology, to take advantage of the demand. And when a company is saying what it's saying, it's telling the stockholders, you know, we're going great, and we're further and further increasing our market share, when that was not even a possibility. Now, Mr. Alessi talks about, and Your Honor asked, what was known during the class period to the defendants, and part of the scienter calculation that was engaged in by the district court was her interpretation of paragraph 105 of the complaint, which is extremely important because that figures throughout her decision. And in paragraph 105 of the complaint, it says, because of the lead and cycle times involved, these canceled orders and loss of market share became evident in the second to third quarters of 2008. The obvious intent of the entire complaint was that the defendants knew about the canceled orders and the loss of market share, but it was not observed by the public until the second and third quarters of 2008 when the revenues started dropping. Much of the opposition to your claims in the complaint is that you really didn't lay out the specifics. What orders were canceled? Who canceled them? When they were canceled? Reading through it, it seems like that was the undercurrent of the district court's decision, that you never really pled who, what, when, where. Right. Well, we pled who, what, when, where in the sense of the information was coming to the defendants from the front, Your Honor. They were getting information from their sales representatives that the customers were dissatisfied with the fact that the company was not able to deliver the product. That was coming right from the source, and that was going up through channels to the top of the company. That's what we pled. Now, to say that we didn't have a specific order that was canceled, sure, we haven't had discovery yet. Now, what's required at this stage of the case is to allege a plausible theory of liability. We've done that. If we were standing here on a summary judgment motion and we didn't have the facts, I would say a different story. Of course, you're running up against the heightened pleading requirements of the PSLRA. Sure, and we have pled the essential facts sufficiently under the PSLRA heightened pleading requirements. We have a confidential source that reports directly to the head of this company whose job it is to tell that man what's going on, and it's his job to gather that information from the field. And he's getting that information directly from the sales reps who deal directly with the customers. So this is not some ballroom conversation that's coming from left field. This is directly coming up the information channel up to the top of the company. What's your best evidence of a strong inference of scienter? Well, the strong inference of scienter is that the defendants are in a position where they're being told in January that the customers are canceling orders, that they're dual sourcing, that they're going to competitors to buy product. Who told whom that who is canceling orders or dual sourcing? So what we have is that there is the man that's named Marcus Wise who is responsible for dealing with the sales reps, tells our confidential witness what the sales reps told him. And then in the course of regular meetings with the company's president, the confidential witness discloses that to the president. Now this is the president of a company that is not a very large company, that we're talking about the company's major product. It's core operation. So Marcus Wise is saying, well, the scumbag out there is people are dual sourcing. No, he doesn't say scumbag. He's saying hearsay. Hearsay science. Hearsay. I mean, it's… I heard from somebody and somebody told me, I mean, hearsay is permitted in a complaint, Your Honor, and this is not… Hearsay is good enough to get you over that high threshold of strong inference of science. That's not all we have, but yes, it is. It is. It's reliable. And while the defense can say what they say, this is not hearsay that's coming from, as I said, you know, an anonymous crazy source. This is coming from the customers. This is coming from the customers to the sales reps to the person who is supposed to deal with the sales reps who reports to the confidential witness, who tells it to Mr. Bastani, who is the head of the company, and this is a core operation of the company. Now for the judge to say that what that paragraph 105 means is that they didn't know that until the second and third quarter, well, that's not reading this complaint in the light most favorable to the plaintiff. The light most favorable to the plaintiff is that that paragraph of the complaint was intended to say, and the whole intent of the complaint was this was not evident to the market until the second and third quarters when the revenues from the cell phones started decreasing. Okay. Mr. Harrison, thank you. My pleasure.